158 F.3d 428
 29 Envtl. L. Rep. 20,112, 98 Cal. Daily Op.
Serv. 7770
 MARICOPA-STANFIELD IRRIGATION AND DRAINAGE DISTRICT, a
Municipal Corporation of the State of Arizona; Central
Arizona Irrigation and Drainage District, a Municipal
Corporation of the State of Arizona; and New Magma
Irrigation & Drainage District, a Municipal Corporation of
the State of Arizona, Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
 No. 97-16432.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 12, 1998.
Decided July 7, 1998.
Opinion Withdrawn Oct. 14, 1998.
Decided Oct. 14, 1998.
 
 Richard G. Patrick, Assistant United States Attorney, Phoenix, Arizona, for defendant-appellant.
 Robert S. Porter, Ellis, Baker & Porter, Phoenix, Arizona, for plaintiffs-appellees.
 John B. Weldon, Jr., Phoenix, Arizona, for amici curiae Salt River Project Agricultural Improvement and Power District, and Salt River Valley Water Users' Association.
 Appeal from the United States District Court for the District of Arizona; Stephen M. McNamee, District Judge, Presiding. D.C. No. CV-94-02188-SMM.
 Before: GOODWIN, PREGERSON, and FERGUSON, Circuit Judges.
 ORDER
 The Opinion filed July 7, 1998 [147 F.3d 1168] is withdrawn.
 OPINION
 PREGERSON, Circuit Judge:
 
 BACKGROUND
 
 1
 The Colorado River and its tributaries are the major sources of water in the arid Southwest. Careful in the years of drought, the United States has established reclamation projects to channel water where it is needed most and to head off disputes among water users. But in its efforts to settle some water rights disputes, sometimes the government creates others. This case involves one such dispute. A working familiarity with the history of water rights legislation in the Southwest is essential to a full comprehension of this controversy.
 
 
 2
 Shortly after the first World War, legislators considered ways to regulate and capture for beneficial use Colorado River flood flows that annually were lost. A dam in Arizona with a canal to California was contemplated. Plans like this one worried inhabitants of the Upper Basin states (Colorado, Utah, New Mexico, and Wyoming), who knew that water rights might be lost forever to the states in the Lower Basin (Arizona, Nevada, and California) under the doctrine of prior appropriation. To forestall water rights disputes, Congress ratified the Colorado River Compact in 1922. See Act of August 19, 1921, art. 2, 43 Stat. 171, reprinted in Ariz.Rev.Stat. § 45-1311. Among other things, the Compact apportioned 7.5 million acre feet ("AF") of water annually to the states in the Lower Basin.[1]
 
 
 3
 But the Compact did not apportion water among the states. The Boulder Canyon Project Act of 1928 parceled water among the Lower Basin states, allotting Arizona 2.8 million AF annually.[2] See 43 U.S.C. § 617 (1998). This Act also gave the Secretary of the Interior broad administrative authority over the water, including the power to apportion water within the states. See id. The Supreme Court confirmed the Lower Basin apportionment in 1963 and recognized the breadth of the Secretary's discretion to allocate Colorado River water. Arizona v. California, 373 U.S. 546, 579-80, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963).
 
 
 4
 The Colorado Basin Project Act was enacted in 1968 to apportion water among the regions of Arizona. See 43 U.S.C. §§ 1501-1556 (1998). This Act authorized the Secretary of the Interior to build, operate, and maintain the Central Arizona Project (the "CAP"), which allocates Arizona's share of Colorado River water after other users with perfected rights take their water. See id. at § 1521. The Act also permitted the Secretary to contract for the repayment of CAP construction costs with a single political subdivision in Arizona. See id. at § 1524. In 1971, Arizona created this subdivision: the Central Arizona Water Conservation District (the "CAWCD"). See Ariz.Rev.Stat. § 48-3701 et seq. (1985). In addition to its duty to contract with the Secretary to finance the CAP, the CAWCD was responsible for subcontracting with users to deliver CAP water and to levy a property tax that partly would offset the CAP's construction and operating costs.
 
 
 5
 The Secretary was left to devise and implement a system for determining how and to whom CAP water would be sold. The Secretary settled upon an allocation-contract mechanism for distributing CAP water. First, in 1983, the Secretary apportioned the right to purchase CAP water by way of general allocations to three priority pools, in descending order of priority: Indian tribes, municipal and industrial users, and non-Indian agricultural users. See CAP Water Allocations, Fed.Reg. 12446-49 (1993) (the "1983 notice").[3] Within those pools, the Secretary allotted CAP water to specific users.[4] Second, after the CAP water was allocated, the allottees could purchase CAP water by way of subcontracts with the United States and the CAWCD. These contracts--and not the allocations themselves--determined how much water CAP allottees actually were entitled to receive.[5]
 
 FACTS AND PRIOR PROCEEDINGS
 
 6
 The plaintiffs are irrigation districts (the "Districts") who were allotted percentages of the non-Indian agricultural pool in the 1983 notice. Each of the Districts entered into a subcontract with the United States Department of the Interior and the CAWCD in November 1983. Pursuant to their contracts, the Districts collectively were scheduled to receive forty-three percent of the CAP non-Indian agricultural water supply. As consideration for these subcontracts, the Districts promised to repay the costs involved in constructing the facilities needed to deliver their CAP water and paid twenty percent in advance.
 
 
 7
 In 1984, after the Secretary of the Interior announced his allotments and after the Districts contracted for their allotted shares of the residual CAP water, Congress entered into a water-rights settlement with the Ak-Chin Tribe. See Act of Oct. 19, 1984, Pub.L. 98-530, § 2(k), 98 Stat. 2698, 2701 (1984) (the "Ak-Chin Settlement Act"). Therein, Congress directed the Secretary of the Interior annually to deliver a permanent supply of 75,000 AF of CAP water to the Ak-Chin Indian Community,[6] or 85,000 AF of water when sufficient water was available. Congress specified the sources and priorities of the water that the Ak-Chin would receive. First, Congress directed the Secretary to allocate to the Ak-Chin Tribe some 50,000 AF of Colorado River water which the Yuma-Mesa Division had abandoned, and which the Secretary had not included in the CAP when he made his 1983 allocations.[7] Second, Congress specified that the Ak-Chin Tribe would keep the 58,300 AF of CAP water allotted to it in the 1983 notice. But because these two sources together produced 23,300 to 33,300 AF more water than the Ak-Chin Tribe was entitled to under the terms of the settlement, Congress stated that the Secretary "shall allocate" this excess Ak-Chin water "on an interim basis to the Central Arizona Project." Act of Oct. 19, 1984, Pub.L. 98-530, § 2(k), 98 Stat. 2698, 2701 (1984).
 
 
 8
 The excess Ak-Chin water allocation remained in the CAP for eight years. In the San Carlos Apache Tribe Water Rights Settlement Act of 1992, Congress provided that the excess Ak-Chin CAP water would be reallocated to the San Carlos Apache Tribe. See San Carlos Apache Tribe Water Rights Settlement Act of 1992, Pub.L. No. 102-575, tit. XXXVII, §§ 3701-3711, 106 Stat. 4740 (the "SCAT Act"). The Districts urged Congress to return the excess Ak-Chin water to the "Central Arizona Project," as the Ak-Chin Settlement Act directed. Congress rejected that plea, but included in the SCAT Act a waiver of sovereign immunity for suits based on a CAP contractor's claim that the SCAT Act unlawfully deprived him of legal rights to the excess Ak-Chin water allocation.
 
 
 9
 On October 28, 1994, the Districts sued the United States in district court.[8] In their suit, the Districts contended that the SCAT Act had taken their rights to the excess Ak-Chin water allocation without just compensation. On December 15, 1995, the parties filed cross-motions for summary judgment on the issue of liability only. The court granted the Districts' motion on February 21, 1997.
 
 
 10
 The government timely appeals.[9] The Districts request attorneys' fees on appeal pursuant to 28 U.S.C. § 2412(d)(1). As we explain below, we reverse the district court's grant of summary judgment to the Districts, and we deny their request for fees.
 
 ANALYSIS
 I.
 
 11
 We have jurisdiction of this interlocutory appeal pursuant to 28 U.S.C. § 1292(b). We review the district court's grant of summary judgment de novo. See Covey v. Hollydale Mobilehome Estates, 116 F.3d 830, 834 (9th Cir.1997). Jurisdictional issues, including questions of standing, also are reviewed de novo. See San Diego Co. Gun Rights Comm. v. Reno, 98 F.3d 1121, 1124 (9th Cir.1996). The construction of a statute is reviewed de novo. See United States v. Hockings, 129 F.3d 1069, 1070 (9th Cir.1997).
 
 II.
 
 12
 For the first time on appeal, the amici argue that the Districts lack standing to sue under the SCAT Act. Generally, issues not raised in the district court cannot be asserted on appeal. Westlands Water Dist. v. Firebaugh Canal, 10 F.3d 667, 673 (9th Cir.1993). But because "Article III standing is a jurisdictional prerequisite," Hickman v. Block, 81 F.3d 98, 101 (9th Cir.1996) (citation omitted), we must consider standing whether or not the issue was raised in the district court. See Firebaugh Canal, 10 F.3d at 673.
 
 
 13
 The Districts bear the burden of demonstrating that they had standing to bring their action. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). To establish standing, the Districts must show three things:
 
 
 14
 First, [the Districts] must have suffered injury to a legally protected interest. This injury must be both concrete and particularized, and actual or imminent rather than conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of. Third, the injury must be redressable by a favorable judicial decision.
 
 
 15
 Hickman, 81 F.3d at 101 (quoting Lujan, 504 U.S. at 559-61, 112 S.Ct. 2130) (citations and internal quotation marks omitted). Amici insist that we lack jurisdiction of this controversy because the Districts have not alleged a particularized injury to a legally protected interest. Amici advance three arguments in support of this position.
 
 
 16
 First, amici point out that only CAP contractors have standing to sue under the SCAT Act. The pertinent provision states:
 
 
 17
 (f) CLAIMS. --(1) The United States District Court for the District of Arizona and the United States Claims Court are authorized to hear and decide any claim brought by the [CAWCD] or other contractors of CAP water. Any such claim shall be filed within two years of the date of enactment of this Act, and shall be heard by the court on an expedited basis. If such a claim is filed and the court grants judgment for the plaintiff(s), the court shall award such relief as it deems proper, and shall award costs and attorneys' fees to the plaintiff(s). Any judgment of the court shall be subject to appeal on the same basis that other judgments of that court are subject to review under existing law.
 
 
 18
 San Carlos Apache Tribe Water Rights Settlement Act of 1992, Pub.L. No. 102-575, tit. XXXVII, § 3709(f)(1), 106 Stat. 4740 (1992) (emphasis added). Amici argue that the Districts relinquished their status as CAP contractors--and correspondingly, their standing to sue under the SCAT Act--when they waived all of their rights to non-Indian agricultural CAP water pursuant to the 1993 amendments to their subcontracts. This argument lacks merit. Assuming that these amendments were binding, none of them purported to terminate the Districts' subcontracts with CAWCD.[10] Although Congress did not define the term "contractor" in the SCAT Act, a reasonable construction of the term would include all entities that had contracted for residual CAP water at the time of the Act--even those who, like the Districts, subsequently amended their subcontracts. And even if the Districts no longer have any contractual right to draw residual CAP water, that fact would bear on the assessment of damages, not the question of liability.
 
 
 19
 Second, amici argue that the Districts lack standing because they failed to show an actual injury, maintaining that the Districts have not demonstrated an actual reduction in the amount of CAP water available to them so far. The amici underestimate the breadth of the SCAT Act's waiver of sovereign immunity. The SCAT Act did not require a CAP allottee to prove that Congress's compromise with the San Carlos Apache Tribe made less water available to him. Instead, the SCAT Act waived sovereign immunity to any "claim that the reallocation of water to the Tribe pursuant to [this] Act has unlawfully deprived the [CAWCD] or other contractors of CAP water of legal rights to such water." San Carlos Apache Tribe Water Rights Settlement Act of 1992, Pub.L. No. 102-575, tit. XXXVII, § 3708(f)(2), 106 Stat. 4740 (1992) (emphasis added). The Districts allege that, by reallocating the excess Ak-Chin water to the CAP, the Ak-Chin Settlement Act automatically reallocated that water to the non-Indian agricultural pool, which water the Districts had purchased under their 1984 subcontracts. If the Districts are correct in their assertion that the excess Ak-Chin water defaulted to them, then the SCAT Act's reallocation of the excess Ak-Chin water to a higher-priority user directly decreased the size of the non-Indian agricultural users' allocations and indirectly deprived the Districts of water due them in their subcontracts. Because a higher-priority right to a CAP water allocation is more valuable than a lower-priority right to the same water, the Districts adequately have alleged that the SCAT Act deprived them of their legal rights to the excess Ak-Chin water allocation.
 
 
 20
 Third, amici argue that any damage that the Districts may sustain in the future is "conjectural or hypothetical" because their subcontracts only entitled them to an annual percentage of an uncertain amount of residual CAP water. Although we recognize that the extent of the Districts' injury is not easily measured, determining the harm they may suffer is not merely guesswork. If the SCAT Act reallocated water that became the Districts' property under the Ak-Chin Settlement Act, then the harm is certain even though its precise valuation may not be. Nor does the ebb and flow of the CAP water supply or the fact that the Districts' losses cannot be measured to the ultimate drop render their past damages speculative. The Supreme Court expressly has declined to hold that "the absence of specificity as to the amount of water to be taken prevents the assessment of damages." Dugan v. Rank, 372 U.S. 609, 623, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).[11] And because the Districts' subcontracts oblige them to repay some portion of the CAP's construction costs, any reduction in the non-Indian agricultural pool's allocation would reduce the maximum amount of CAP water and would limit the revenues that the Districts could generate to repay those contractual obligations. We have found standing in similar circumstances. See Central Ariz. Water Conservation Dist. v. United States Envtl. Protection Agency, 990 F.2d 1531, 1539 (9th Cir.1993) (holding that the CAWCD had standing to litigate an EPA rule that would require a hydroelectric plant on the Colorado River to buy and install emissions-control devices, where the Bureau of Reclamation owned the plant and the CAWCD was obliged to pay a share of the Bureau's costs).
 
 
 21
 In sum, the Districts have alleged a concrete injury. The amici do not allege that the other standing requirements are absent, but the Districts have established that the SCAT Act caused any injury they may have suffered, and that we have the power to redress such an injury. See Hickman, 81 F.3d at 101. Because the Districts have standing to sue under the SCAT Act, we must reach the merits of this case.
 
 III.
 
 22
 The Districts insist that Congress abrogated their subcontracts with the CAWCD by directing the Secretary to reallocate the excess Ak-Chin water to the San Carlos Apache Tribe in the SCAT Act. The federal government may not deprive a person of "property without due process of law." U.S. Const. amend. V. To demonstrate a wrongful taking, the Districts must show two things. First, the Districts must demonstrate a protected property interest in the excess Ak-Chin water. See Peterson v. United States Dep't of the Interior, 899 F.2d 799, 807 (9th Cir.1990). Second, if the Districts can show a protected interest in the excess Ak-Chin water, they must show that the SCAT Act substantially impaired their contractual rights to that property. See National R.R. Passenger Corp. v. A.T. & S.F.R. Co., 470 U.S. 451, 472, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985).
 
 
 23
 The Districts allege that their property interest in the excess Ak-Chin water springs from both their 1983 subcontracts with the CAWCD, and from the Ak-Chin Settlement Act. The Districts' subcontracts can be the wellspring of property rights. See id. at 465-66, 105 S.Ct. 1441; see Madera Irrig. Dist. v. Hancock, 985 F.2d 1397, 1401 (9th Cir.1993) (holding that "a valid contract right of an irrigation district against the United States is property protected by the Fifth Amendment"). Because we are asked to construe the Districts' subcontracts, we must interpret them "against the backdrop of the legislative scheme that authorized them, and ... in light of the policies underlying the controlling legislation." Peterson, 899 F.2d at 807. Likewise, the Ak-Chin Settlement Act could have conferred on the Districts a property interest in the excess Ak-Chin water. See Dodge v. Board of Educ. of City of Chicago, 302 U.S. 74, 78, 58 S.Ct. 98, 82 L.Ed. 57 (1937) (stating that the government can incur contractual obligations "where a statute confirms a settlement of disputed rights and defines its terms") (footnote omitted).
 
 
 24
 The Districts' claim to a property right in the excess Ak-Chin water boils down to two observations and an inference. First, the Districts note that the 1983 notice provides that "[t]he CAP water allocations to the non-Indian agricultural users shall include the remaining supplies and are expressed as percentages of water available to non-Indian agriculture." CAP Water Allocations, 48 Fed.Reg. 12446, 12449 (1983). Next, the Districts point out that the Ak-Chin Settlement Act directs the Secretary to "allocate" the excess Ak-Chin water "on an interim basis to the Central Arizona Project" without naming a specific allottee or class of allottees. Act of Oct. 19, 1984, Pub.L. 98-530, § 2(k), 98 Stat. 2698, 2702 (1984). From these two textual observations the Districts urge us to infer that, under the terms of the 1983 notice, allocating water to the "Central Arizona Project" rather than to a specific user or user class automatically and irrevocably would allocate that water to the non-Indian agricultural pool.
 
 
 25
 Whether this inference legitimately may be drawn depends upon our construction of the Ak-Chin Settlement Act. In particular, we must determine what Congress intended when it designated the "Central Arizona Project" as the recipient of the excess Ak-Chin water. "When interpreting a statute, we look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress." Hockings, 129 F.3d at 1070 (citation and internal quotation marks omitted). Upon scrutiny of the language in and the policy behind the Ak-Chin Settlement Act, as informed by the legislative structure of the CAP, we conclude that the Act gave the Districts no property right in the excess Ak-Chin water.
 
 
 26
 First, no language in the Ak-Chin Settlement Act supports the inference that water allocated to the "Central Arizona Project" would fall to the Districts' portions. When Congress directed the Secretary to allocate the excess Ak-Chin water to the "Central Arizona Project," it used a term defined by statute. Under 43 U.S.C. § 1521, the CAP is a multitude of canals and aqueducts radiating from dams and reservoirs. And in the practical language of the 1983 notice, the CAP is the sum of all the allocations. Neither Congress nor the Secretary ever equated the CAP with one priority pool or a particular user. Whenever Congress has wished to allot water to a specific CAP priority pool or CAP user, it has used clear language to do so.[12] Congress's failure to designate a specific user or user class convinces us that, even if the excess Ak-Chin water generally was available to the Districts before 1992, the Ak-Chin Settlement Act conferred upon them no protectable property interest. See Central Mont. Elec. Power Coop. v. Administrator, 840 F.2d 1472, 1477 (9th Cir.1988) (stating that "[i]f Congress intended to establish a Montana preference for Libby power, it would have expressly set forth a preference as it did when it authorized construction of the Hungry Horse Dam").[13]
 
 
 27
 Second, the Districts' interpretation of the Ak-Chin Settlement Act finds no support in the meager policy articulated in the Act, whose sole stated objective was to secure for the Ak-Chin Tribe a permanent water supply. See Act of Oct. 19, 1984, Pub.L. 98-530, § 1, 98 Stat 2698 (1984). Nor can the Districts' interpretation of the Ak-Chin Settlement Act be squared with the policies and the design of the CAP. As a matter of policy, the CAP was created "[f]or the purposes of furnishing irrigation water and municipal water supplies to the water-deficient areas of Arizona ... control of floods, conservation and development of fish and wildlife resources, enhancement of recreation opportunities, and for other purposes." 43 U.S.C. § 1521(a) (1998). The other purposes include ensuring the repayment of the CAP's own construction and operation costs, and keeping as little of the Colorado River as possible from evaporating or flowing unused into the Sea of Cortez. See 43 U.S.C. §§ 423(e), 1524(c) (1998). These purposes are furthered by the Secretary's trickle-down construction of the CAP, which aims to maximize CAP use (and incidentally, to minimize waste) by prioritizing the contract rights of allottees. See CAP Water Allocations, 48 Fed.Reg. 12446, 12449 (1983). Anticipating urban growth and a concomitant decline in agriculture in Arizona, the Secretary gave cities and tribes more secure water entitlements than those possessed by the non-Indian agricultural users. See CAP Water Allocations, 48 Fed.Reg. 12446, 12451 (1983) (stating that the supply available to non-Indian agricultural allottees would "decrease during the project life"). These purposes are best served by cycling CAP water allocations rights through the whole priority structure rather than by vesting them at the lowest level of that structure, particularly because the non-Indian agricultural pool historically has underutilized its allotments, and has been able to pay less than the other pools for the water that it has utilized. See generally Robert J. Glennon, Coattails of the Past: Using and Financing the Central Arizona Project, 27 Ariz. St. L.J. 677 (1995) (discussing non-Indian agricultural users' underuse of their allotments and the downward pressure on prices charged of those users relative to the prices charged of municipal and industrial allottees). The Districts' interpretation of the Ak-Chin Settlement Act as giving them a permanent priority entitlement to the excess Ak-Chin water is simply untenable in light of these objectives. As a matter of design, neither contract rights nor allocations automatically default to users by ordinary operation of the CAP. When a user does not contract to receive all the water available to him under his allocation, his right to contract for that water devolves upon the Secretary.[14] And post-1983 allocations to the CAP do not fall to a particular user or user class, but remain at the Secretary's discretionary disposal, because the users' allotments were predicated on the amount of water in the CAP in 1983.[15] The way that the Secretary has treated the excess Ak-Chin water between the two Indian water rights settlements is faithful to the CAP allocation structure as we have described it.[16] To hold that the excess Ak-Chin water falls automatically to the Districts would turn the CAP's system of priorities on its head.
 
 
 28
 Only by ignoring the language and purpose of the Ak-Chin Settlement Act, and only by forgetting the policies and design of the CAP could we conclude that the Districts enjoyed an interest in the excess Ak-Chin water. But even then the Districts could claim no enduring property right unless that interest rose to the level of an entitlement. See City of Santa Clara v. Andrus, 572 F.2d 660, 676 (9th Cir.1978). Because the Districts allege that their subcontracts and the settlement together created their property interest, they are not entitled to the excess Ak-Chin water unless they prove two things. First, the Districts must prove that Congress eliminated the Secretary's discretion to reallocate the excess Ak-Chin water.[17] See id. Out of respect for the Secretary's broad discretionary authority over the waters of the Colorado River,[18] we assume that "had Congress intended to fetter the Secretary's discretion, it would have done so in clear and unequivocal terms." Id. at 667 (quoting Arizona v. California, 373 U.S. at 580, 83 S.Ct. 1468). Second, the districts must demonstrate that Congress clearly foreclosed its own prerogative to order that water reallocated in subsequent legislation. Ordinarily, "contractual arrangements, including those to which a sovereign itself is party, remain subject to subsequent legislation by the sovereign." O'Neill v. United States, 50 F.3d 677, 686 (9th Cir.1995). Because we are wary of constructions that would give government contracts the force of indelible laws, we assume that "[t]he sovereign's power to enact subsequent legislation affecting its own contractual arrangements endures, albeit with some limitations, unless surrendered in unmistakable terms." Peterson, 899 F.2d at 808 (quoting Bowen, 477 U.S. at 52, 106 S.Ct. 2390 (internal quotation marks omitted)).
 
 
 29
 The Districts argue that Congress limited the Secretary's discretion to reallocate the water when it stated that he "shall allocate ... on an interim basis " the excess Ak-Chin water from the Ak-Chin Tribe "to the Central Arizona Project." Act of Oct. 19, 1984, Pub.L. 98-530, § 2(k), 98 Stat 2698 (1984) (emphasis added). This argument simply does not wash. Even if the term "Central Arizona Project" were synonymous with the non-Indian agricultural pool--an interpretation we already have rejected--nothing in the Ak-Chin Settlement Act prevents the Secretary from reallocating CAP water from the Central Arizona Project to a particular CAP user. In fact, the Ak-Chin Settlement Act actually reaffirms the Secretary's CAP allocation power. By directing the Secretary to allocate CAP water, Congress actually underscored the Secretary's undisputed allocation authority.[19] By instructing the Secretary to allocate the excess Ak-Chin water to the "Central Arizona Project" rather than to specific users such as the Districts, and by using the phrase "interim basis" rather than some specific or permanent duration, Congress preserved the Secretary's allocation discretion.[20] For these reasons, we hold that the Ak-Chin Settlement Act did not divest the Secretary of his discretion to allocate the excess Ak-Chin water when it instructed him to allocate that water "on an interim basis to the Central Arizona Project." Act of Oct. 19, 1984, Pub.L. 98-530, § 2(k), 98 Stat 2698 (1984).
 
 
 30
 Nor have the Districts shown that Congress relinquished in "unmistakable terms" its own power to order the excess Ak-Chin water reallocated. Because we have concluded already that the Ak-Chin Settlement Act does not limit the Secretary's discretion, to conclude that the language of that Act surrenders Congress's own prerogative to order a reallocation would not be unmistakable, but unthinkable. But even if we were persuaded that the phrase "shall allocate" in the Ak-Chin Settlement Act somehow limited the Secretary's discretion to reallocate the excess Ak-Chin water, neither that phrase nor any other language in the Act purports to limit Congress's power to command a reallocation later. In fact, the terms of the Districts' subcontracts show that the parties anticipated legal changes and agreed to limit the government's liability for shortages, whatever their cause. In circumstances like these, we have held that water reclamation contracts are not immune to subsequent statutory modifications. See O'Neill, 50 F.3d at 686 (finding that Congress had not unmistakably waived its right to amend the amount of water it was obligated to deliver pursuant to water service contracts where "[t]he contract contemplates future changes in reclamation laws ... and ... limits the government's liability for shortages due to any causes").
 
 
 31
 In sum, the Districts have not demonstrated that the Ak-Chin Settlement Act automatically brought the excess Ak-Chin water allotment within the allocation of the non-Indian agricultural pool. The language of the Ak-Chin Settlement Act as well as the CAP's purposes and structure rather point to the contrary conclusion. And even if the Districts somehow did acquire a provisional right to the excess Ak-Chin water allotment, they have not demonstrated that Congress intended for that right to be irrevocable. Congress did not foreclose the Secretary's discretion, and it did not relinquish its own legislative prerogative. For these reasons, we conclude that the Districts have demonstrated no protected property interest in the excess Ak-Chin water allocation. Because the Districts have not shown that they had any property right to the excess Ak-Chin allocation that the SCAT Act could have substantially impaired, our inquiry is complete. See Barcellos and Wolfsen v. Westlands Water Dist., 899 F.2d 814, 821 (9th Cir.1990).
 
 CONCLUSION
 
 32
 For the foregoing reasons, we reverse the district court's grant of summary judgment to Plaintiffs. Plaintiffs' motion for attorneys' fees on appeal is denied.
 
 
 33
 REVERSED.
 
 
 
 [1]
 The Compact guaranteed an equal amount of water to the Upper Basin states. The Upper Basin water supply is not at issue in this lawsuit
 
 
 [2]
 California received 4.4 million AF annually, and Nevada annually was entitled to 300,000 AF. Neither of these water apportionments is at issue in this suit
 
 
 [3]
 In the years preceding the final allocations published in the 1983 notice, the Secretary considered and rejected all six allocation methods proposed by various public and private entities. Instead, the Secretary adopted a system that represented an amalgam of two of the proposals he had heard. See CAP Water Allocations, 48 Fed.Reg. 12446, 12446 (1983). The Secretary decided that the Indian tribes, which include the Ak-Chin and the San Carlos Apache Tribes, could contract for up to 309,000 AF of water from the CAP. See CAP Water Allocations, 48 Fed.Reg. at 12447. Municipal and industrial users were entitled to contract for as much as 640,000 AF of CAP water. See CAP Water Allocations, 48 Fed.Reg. at 12447-49. The non-Indian agricultural pool was allotted the right to contract for whatever CAP supply remains after the tribal, municipal, and industrial users purchased the water allotted to them in 1983. See CAP Water Allocations, 48 Fed.Reg. at 12449
 
 
 [4]
 Users in the Indian and municipal and industrial pools each were allocated specific acre-footage amounts of CAP water. The users in the lowest-priority non-Indian agricultural pool each were allotted a percentage of the remaining 1983 CAP supply, as projected in the 1983 notice
 
 
 [5]
 Under the CAP hydraulics, the allocations listed in the 1983 notice determined how much CAP water that the various pools and users could purchase. Water "availability," which was impacted by the demands of higher-priority users and drought conditions, determined the quantity of water that CAP users actually could buy. See CAP Water Allocations, 48 Fed.Reg. 12446-49 (1983). Within these parameters, how much water CAP users received was limited only by their demand. Thus, users who wanted to receive the CAP water allotted to them were required to contract for it
 
 
 [6]
 The Ak-Chin Community is an Executive Order reservation located approximately 30 miles south of Phoenix, Arizona
 
 
 [7]
 In the proceedings leading up to the Ak-Chin Settlement Act, Congress heard the Districts complain that the Yuma-Mesa Division water was already part of the CAP and thus, unavailable for allocation to the Ak-Chin Tribe. Ultimately Congress rejected the Districts' complaint, allocating the unused Yuma-Mesa Division water to the Ak-Chin Tribe and allocating the excess Ak-Chin water to the CAP. See Act of Oct. 19, 1984, Pub.L. 98-530, §§ 2(f)(1), 2(k), 98 Stat. 2698, 2699, 2701 (1984)
 In an effort to show that they relinquished something of value in exchange for Congress's allocation of the excess Ak-Chin water to the CAP, the Districts renew their argument that the Yuma-Mesa Division water already was allocated to the CAP when Congress diverted that allotment to the Ak-Chin Tribe in 1984. There simply is no evidence that the Secretary ever allocated this water to the CAP. See Letter from James Watt, Secretary of the United States Department of the Interior, to Congressman Morris D. Udell 6 (Oct. 7, 1983) (stating that the Yuma-Mesa Division water "has not been included in calculations of the water committed to the CAP").
 What Arizona representatives may have hoped is irrelevant to whether the water actually was allocated to the CAP. Likewise, whether officials from the Bureau of Reclamation and the Arizona Water Commission may have projected that the Yuma-Mesa Division water would be included in the CAP is immaterial. The Secretary is not obliged to accept those projections. See Central Arizona Project, 45 Fed.Reg. 81265, 81271 (1980) (rejecting the projections of CAP water availability made by two state agencies). For these reasons, we recognize that the Districts have not created a genuine issue of material fact that the Yuma-Mesa Division water was included in the allocations published in the 1983 notice.
 
 
 [8]
 Neither the Ak-Chin nor the San Carlos Apache Tribe is involved in this controversy. Because the Districts are seeking damages rather than injunctive relief, the outcome of this case will have no effect on the rights secured to those tribes in their respective settlements with the United States
 
 
 [9]
 The Salt River Project Agricultural Improvement and Power District (a political subdivision of Arizona) and the Salt River Valley Water User's Association (an Arizona corporation) were parties to the SCAT Act. See San Carlos Apache Tribe Water Rights Settlement Act of 1992, Pub.L. No. 102-575, tit. XXXVII, § 3705(a), (c), 106 Stat. 4740, 4744-45 (1992). Both filed an amicus brief in support of the government, arguing that the Districts lacked standing to sue under SCAT Act and that the district court therefore lacked jurisdiction
 
 
 [10]
 Quite to the contrary, the terms of the amendments made clear that the parties did not intend to extinguish Districts' rights to seek redress for any taking that the SCAT Act effectuated. Although the intention of the parties is not dispositive of the issue of standing because the parties may not confer Article III jurisdiction on this court, each of the Districts signed CAWCD proposals which stated: "Nothing herein is intended to require or imply that [Districts have] waived any rights or claims which [they] may have against the United States pursuant to § 3708(f) of the [SCAT Act]."
 
 
 [11]
 The Court noted further that although "the Government did not announce that it was taking water rights to a specified number of 'gallons' or, for that matter, 'inches' of water, we do not think that this quantitative uncertainty precludes ascertainment of the value of the taking." Id
 
 
 [12]
 See Salt River Pima-Maricopa Indian Community Water Rights Settlement Act of 1988, Pub.L. 100-512, § 11(h), 102 Stat. 2549 (1988) (stating that "the Secretary shall reallocate such water for non-Indian agricultural use"); see San Carlos Apache Tribe Water Rights Settlement Act of 1992, Pub.L. No. 102-575, tit. XXXVII, § 3704(a), 106 Stat. 4740 (1992) (directing the Secretary to reallocate the excess Ak-Chin water "for the exclusive use of the [San Carlos Apache] Tribe")
 
 
 [13]
 Ordinary contract law principles dictate that incidental beneficiaries may not sue on contract. See Rest. of Contracts § 133(1)(c) (1932). Analogously, those who receive a windfall from a federal settlement will not be heard to complain that a taking has occurred when the law subsequently is changed. See Dodge, 302 U.S. at 79, 58 S.Ct. 98 (stating that "[i]f, upon construction of a statute, it is found that the payments are gratuities, involving no agreement of the parties, the grant of them creates no vested right") (footnote omitted)
 The Districts never were more than incidental beneficiaries of the Ak-Chin Tribe's settlement with the government. The Districts were not parties to the Ak-Chin Settlement Act. The United States was not settling a "debt" with the Districts in the Ak-Chin Settlement Act, nor did the Districts provide some other independent consideration for Congress's dispensation of the excess Ak-Chin water to the CAP. In these circumstances, the Districts can claim no property right that can withstand Congress's legislative authority. See Bowen v. Public Agencies Opposed to Social Security Entrapment, 477 U.S. 41, 55-56, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986); see Peterson, 899 F.2d at 811. Congress's assignment of the excess Ak-Chin water to the "CAP" rather than to the Districts or their priority pool is at best weak evidence of any intent to benefit the Districts, even in light of the wrangling over the Yuma-Mesa Division water.
 
 
 [14]
 The 1983 notice provides that "the Secretary of the Interior will retain the right to contract for water sales on an interim basis where water allottees are not utilizing the[ir] full CAP allotment[s]." CAP Water Allocations, 48 Fed.Reg. 12446, 12449 (1984). We emphasize that the right to contract for unwanted water belongs to the Secretary, not any one user; and this right affects contracts, not allocations
 
 
 [15]
 The 1983 notice made it abundantly clear that the lodestar of the non-Indian agricultural pool's allocation always would be whatever supply "remained" after the original round of allocations. See CAP Water Allocations, 48 Fed.Reg. 12446, 12449 (1983) (stating that the non-Indian agricultural pool's "allocation for years subsequent to [the original allocation in the 1983 notice] will be based on the [allocation in the 1983 notice] minus the supply ... removed from irrigation ") (emphasis added)
 
 
 [16]
 The Secretary has not behaved in any way consistent with the Districts' assertion that water allocated to the CAP flowed directly into the non-Indian agricultural pool. Specifically, the Secretary never treated the Districts as having automatic access to this or any other water allocated to the "Central Arizona Project." Quite to the contrary, the Secretary publicly treated the excess Ak-Chin water as remaining in the Indian priority pool between the Ak-Chin Settlement and the SCAT Acts. See CAP Reallocation Decision, 57 Fed.Reg. 4470, 4476 (1992) (in which the Secretary stated that "[t]he 'excess Ak-Chin water' has been and continues to be considered as Indian water")
 
 
 [17]
 The Districts do not seriously dispute that the Secretary retained his discretion to allocate and reallocate CAP water under the 1983 notice and under their subcontracts with the CAWCD. In effect the Districts conceded that the 1983 notice preserved the Secretary's discretion to reallocate CAP water when they argued in their briefs that Congress eliminated the Secretary's discretion to reallocate the excess Ak-Chin water in the Ak-Chin compromise. The language of the 1983 notice makes crystal clear that the Secretary's discretion over the CAP includes the power to allocate CAP water. See CAP Water Allocations, 48 Fed.Reg. 12446, 12450 (1983) (stating that "[t]he Secretary of the Interior has the responsibility for allocating CAP waters"). In fact, the Secretary specifically informed allottees that he intended to retain his authority to reallocate CAP water even after the notice of "final" water allocations. See CAP Water Allocations, 48 Fed.Reg. at 12447 (stating that, after a six-month contracting period, the Secretary for the Arizona Department of Water Resources would recommend that the Secretary of the Interior "reallocat[e] any remaining M & I or non-Indian agricultural water not contracted for during the initial contract period"); see CAP Reallocation Decision, 57 Fed.Reg. 4470, 4471 (1992) (confirming that "[t]he 1983 notice provided for a reallocation of the CAP water after an initial round of water service contracting had been completed.")
 
 
 [18]
 The Secretary "is vested with considerable control over the apportionment of Colorado River waters." Arizona v. California, 373 U.S. at 593, 83 S.Ct. 1468. The Secretary's generous measure of discretion survived the Colorado River Basin Project Act, which directed him to "construct, operate, and maintain" the CAP. See 43 U.S.C. § 1521(a)
 
 
 [19]
 The Ak-Chin Settlement Act provided that "[n]othing in this Act shall be construed to enlarge or diminish the authority of the Secretary with regard to the Colorado River." Act of Oct. 19, 1984, Pub.L. 98-530, § 8, 98 Stat 2698 (1984). Read in light of this provision, Congress's mandate that the Secretary reallocate the excess Ak-Chin water confirms that the Secretary had the discretion to reallocate CAP water after the 1983 allotments
 
 
 [20]
 We note that Congress knows what language to use when it wants to give an allottee a property entitlement to CAP water. See San Carlos Apache Tribe Water Rights Settlement Act of 1992, Pub.L. 102-575, tit. XXXVII, § 3704(a), 106 Stat. 4740 (1992) (directing the Secretary to "reallocate [CAP water] for the exclusive use of the Tribe"); see Act of Oct. 19, 1984, Pub.L. 98-530, § 2(f)(1), 2(k), 98 Stat. 2698 (directing the Secretary to reallocate a "permanent supply" of water for the "exclusive use" of the Ak-Chin Tribe)