105 F.3d 1281
 97 Cal. Daily Op. Serv. 454, 97 Daily Journal
D.A.R. 715
BAY VIEW, INC., on behalf of AK NATIVE VILLAGE CORPORATIONS;
Lewis Olsen, Plaintiffs-Appellants,
v.
AHTNA, INC.; Artic Slope Regional; Bering Straits Regional
Corp.; Calista Corp.; Chugach Alaska Corp.; Cook Inlet
Region; Koniag, Inc.; Sealaska Corp.; The Aleut Corp.;
Roy S. Ewan; Jacob Adams; Jack Carpenter; Roy M.
Huhndorf; Frank Pagano; Alice Petrivelli; Bristol Bay
Native Corporation; Nana Regional Corp.; Johnny Hawk;
Michael Chittick; Morris Thompson; Byron Mallot,
Defendants-Appellees.
 No. 95-35857.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 5, 1996.
Decided Jan. 21, 1997.
 
 Samuel J. Fortier, Fortier & Mikko, Anchorage, Alaska; Thomas A. Holman, Lefrak & Holman, New York City, for plaintiffs-appellants.
 David C. Crosby, Wickwire, Greene, Crosby, Brewer & Seward, Juneau, Alaska, for defendants-appellees Artic Slope Regional Corporation and Jacob Adams.
 William H. Timme, Middleton & Timme, Anchorage, Alaska, for defendants-appellees Koniag, Inc. and Frank Pagano.
 Patrick Anderson, Juneau, Alaska, for defendants-appellees Ahtna, Inc. and Roy S. Ewan.
 James D. Linxwiler, Guess & Rudd, Anchorage, Alaska, for defendants-appellees Calista Corp., Johnny Hawk, Bering Straits Regional Corp., and Jack Carpenter.
 Paul W. Koval, Koval & Featherly, Anchorage, Alaska, for defendants-appellees The Aleut Corp. and Alice Petrivelli.
 Bruce E. Gagnon, Atkinson, Conway & Gagnon, Anchorage, Alaska, for defendants-appellees Sealaska Corp. and Byron Mallot.
 Mark Rindner, Lane, Powell, Spears & Lubersky, Anchorage, Alaska; William D. Temko, Munger, Tolles & Olson, Los Angeles, California, for defendants-appellees Cook Inlet Region, Inc. and Roy Huhndorf.
 John H. Sharer, Gibson, Dunn & Crutcher, Los Angeles, California, for defendants-appellees Doyon, Limited and Morris Thompson.
 Philip Blumstein, Birch, Horton, Bittner & Cherot, Anchorage, Alaska, for defendants-appellees Chugach Alaska Corp. and Michael Chittick.
 Leroy J. Barker and Julia B. Bockmon, Robertson, Monagle & Eastaugh, Anchorage, Alaska, for defendant-appellee Bristol Bay Native Corp.
 Appeal from the United States District Court for the District of Alaska, H. Russel Holland, Chief Judge, Presiding. D.C. No. CV-94-00551-HRH.
 Before: GOODWIN, BRUNETTI and KOZINSKI, Circuit Judges.
 Opinion by Judge KOZINSKI.
 OPINION
 KOZINSKI, Circuit Judge.
 
 
 1
 We decide whether a court may strike down a statute as violating the takings clause when the Tucker Act, 28 U.S.C. § 1491, provides an avenue for obtaining compensation.
 
 
 2
 * Congress giveth and it taketh away. At most, that's what happened here to appellants, an Alaska native village corporation and an at-large shareholder of a Regional Corporation. In 1971, Congress cut an unusual deal with Alaskan natives: In exchange for extinguishing all aboriginal title claims, Congress passed the Alaska Native Claims Settlement Act (ANCSA), which gave natives 40 million acres of land, almost $1 billion in cash and shares of stock in newly-created native corporations. See H.R.Rep. No. 523, 92nd Cong., 1st Sess., reprinted in 1971 U.S.C.C.A.N. 2192, 2193; 43 U.S.C. § 1601 et. seq. The land and money were distributed among 13 Regional Corporations and over 200 Village Corporations, each of which lies within the territory of a Regional Corporation. Because not all land in Alaska is of equal value, the Regional Corporations are required to even out the bounty by sharing with each other 70% of their revenue derived from natural resources. 43 U.S.C. § 1606(i). In turn, each Regional Corporation must distribute 50% of the "shared revenue" to its assigned Village Corporations and at-large shareholders. 43 U.S.C. § 1606(j).[1]
 
 
 3
 In 1984 native corporations discovered gold, not on their land but in their balance sheets. As part of the Deficit Reduction Act, Congress prohibited the selling of Net Operating Losses (NOLs), a tax shelter device whereby a profitable company buys the losses of an unprofitable company and sets those losses off against its own taxable income. Senator Ted Stevens of Alaska, however, managed to carve out an exception for Alaska native corporations, authorizing them to sell their NOLs. Pub.L. No. 98-369, § 60(b)(5), 98 Stat. 494, 579 (1984). After Congress passed clarifying language in 1986 to quash Internal Revenue Service resistance to this device, see Tax Reform Act of 1986, Pub.L. No. 99-514, § 1804(e)(4), 100 Stat.2085, 2801, an army of investment bankers and lawyers swarmed in from the lower forty-eight and went to work turning the native corporations' lemons into lemon ices.
 
 
 4
 Here's how it all worked: Due to a combination of bad management and a crash in timber prices, native corporations racked up huge paper losses.[2] For example, a native corporation would sell timber valued for tax purposes at $110 for $10. It would then sell the $100 loss to a profitable corporation. The profitable corporation, in turn, would apply the $100 loss against taxable income. If the corporation was in the 34% tax bracket, it would save $34 on each $100 loss it bought. The profitable corporation thus would pay around $30 to the native corporation for the $100 loss. See 141 Cong. Rec. S11345 (daily ed. Aug. 3, 1995) (statement of Sen. Stevens).
 
 
 5
 This device turned out to be far more popular than anticipated by those who thought of it as a discreet way to give the Alaskan natives a subsidy without having to list it as a budget item. See 132 Cong. Rec. S8175-76 (daily ed. June 23, 1986) (statement of Sen. Stevens) ("[T]he [NOL] Amendment is grounded in social policy, the policies of ANCSA, not in tax policy considerations."). When the dust settled, around $1.5 billion in losses had been sold, generating around $425 million in revenue for native corporations. What was expected to cost the United States Treasury about $50 million ended up costing over $500 million. See Bob Ortega, Ice Fishing: How Pillsbury, Quaker Oats, and Drexel Burnham Got Millions in Cool Cash from Alaska's Eskimos; Scams, Hustles, and Boondoggles, Wash. Monthly, July 1988, at 10. Sobered by the experience, Congress hastened to shut down the enterprise in 1988. See Technical & Miscellaneous Revenue Act of 1988, Pub.L. No. 100-647, § 5021, 102 Stat. 3342, 3666.[3]
 
 
 6
 The only complaint seems to be that not everyone got in on the action because not all regional corporations had NOLs to sell. Although section 7(i) of ANCSA requires sharing of resource-based revenue among the Regional Corporations, 43 U.S.C. § 1606(i), ten of the Regional Corporations agreed not to share NOL revenue as part of a Mutual Assistance Agreement (MAA).[4] This cut out village corporations and at-large shareholders whose Regional Corporations were unable to get in on the bounty.
 
 
 7
 So, appellants filed a class action lawsuit on behalf of all village corporations and at-large shareholders against the Regional Corporations, seeking a share of this revenue. The suit was dismissed because the district court held ANCSA did not give village corporations and at-large shareholders an implied right of action to enforce section 7(i) against the Regional Corporations; they could, the district court said, sue in state court under state law. This appeal followed.
 
 II
 
 8
 While this case was on appeal, Congress wiped out any claim appellants might have had to shared NOL revenue. In 1995, Congress amended ANCSA section 7(i) to exclude NOL revenue from that section's sharing requirement. See Pub.L. No. 104-42, § 109, 109 Stat. 353, 357 (1995) (codified as amended at 43 U.S.C. § 1606(i)(2)) ("For purposes of this subsection, the term 'revenues' does not include any benefit received or realized for the use of losses incurred or credits earned by a Regional Corporation."). Congress made the 1995 Amendment fully retroactive. Id. Thus, we need not decide whether village corporations or at-large shareholders have an implied right of action to enforce section 7(i) in federal court. Even if they did, they can't recover because Congress now has taken away whatever rights they may have had.
 
 
 9
 Appellants struggle to jump-start their case by arguing that the 1995 Amendment is an unconstitutional taking and therefore void. See Appellants' Reply Br. at 16; see also Appellants' Opening Br. at 10 ("the United States should be held accountable" for Appellants' lost share of NOL revenue). Appellants have two arrows in their quiver. They argue that the 1995 Amendment amounts to a taking and therefore is unconstitutional. Appellants, however, fail to appreciate that the government is not prohibited from taking private property; indeed the eminent domain clause contemplates that the government will take private property as needed for public purposes, so long as it pays compensation. See U.S. Const. amend. V; see also First English Evangelical Lutheran Church v. Los Angeles County, 482 U.S. 304, 314, 107 S.Ct. 2378, 2385, 96 L.Ed.2d 250 (1987) ("[The Fifth Amendment] does not prohibit the taking of private property, but instead places a condition on the exercise of that power."). And the government need not provide immediate compensation at the time of the taking; it must simply "provide[ ] an adequate process for obtaining compensation." Williamson County Regional Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 194, 105 S.Ct. 3108, 3121, 87 L.Ed.2d 126 (1985).
 
 
 10
 The federal government has provided such a compensation process by consenting to suit in the United States Court of Federal Claims under the Tucker Act. 28 U.S.C. § 1491(a)(1) (creating jurisdiction over any suit "against the United States founded ... upon the Constitution"); 28 U.S.C. § 1505 (creating jurisdiction over similar suits brought by "any tribe, band, or other identifiable group of American Indians residing within ... Alaska"). The Tucker Act is not merely a waiver of sovereign immunity; it's also an implicit promise by Congress to pay compensation for all takings of private property for public purposes. See Yearsley v. W.A. Ross Construction Co., 309 U.S. 18, 21, 60 S.Ct. 413, 414-15, 84 L.Ed. 554 (1940). "The critical question in [a takings] case, therefore, is whether a Tucker Act remedy is available for claims arising out of takings pursuant to [an act of Congress]." Preseault v. ICC, 494 U.S. 1, 12, 110 S.Ct. 914, 922, 108 L.Ed.2d 1 (1990).
 
 
 11
 Here, appellants clearly are entitled to bring a Tucker Act claim because Congress did not explicitly preclude such suits when it enacted ANCSA. See Inupiat Community v. United States, 230 Ct.Cl. 647, 680 F.2d 122, 127 ("The general rule in taking cases, however, is that a promise to pay just compensation is implied unless Congress has explicitly disavowed it. There has been no disavowal [under ANCSA]." (citations omitted)), cert. denied, 459 U.S. 969, 103 S.Ct. 299, 74 L.Ed.2d 281 (1982). Thus, appellants' takings claim is "premature until [they have] availed [themselves] of the process provided by the Tucker Act." Preseault, 494 U.S. at 11, 110 S.Ct. at 921 (quoting Williamson, 473 U.S. at 195, 105 S.Ct. at 3121). Because appellants can sue the United States in the Court of Federal Claims, the 1995 Amendment is not an uncompensated taking. We therefore have no basis for holding 43 U.S.C. § 1606(i)(2) invalid as appellants suggest. See Ruckelshaus v. Monsanto, Co., 467 U.S. 986, 1016, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking." (footnote omitted)).
 
 
 12
 In seeking invalidation, appellants ask us to repeat a common and oft-overlooked error committed by federal courts in addressing the merits of takings claims against the United States. The simple fact is that we have no jurisdiction to address the merits of takings claims where Congress has provided a means for paying compensation for any taking that might have occurred. See, e.g., Far West Federal Bank v. Director OTS, 951 F.2d 1093, 1100 (9th Cir.1991) ("Since a taking, if one occurred, was authorized by Congress, and a suit for compensation is within the jurisdiction of the Court of Claims [sic], we do not reach the question of whether a taking occurred."); see also Regional Rail Reorganization Act Cases, 419 U.S. 102, 126, 95 S.Ct. 335, 349-50, 42 L.Ed.2d 320 (1974) (the availability of a Tucker Act remedy is presumed unless Congress in enacting a specific statute has "withdrawn the Tucker Act" (emphasis in original)).
 
 
 13
 The Supreme Court is partly to blame for this confusion, as it has sometimes reached the merits of takings claims against the United States and at other times refused. Compare Monsanto, 467 U.S. at 1016, 104 S.Ct. at 2879-80 (determining that a federal statute worked a taking but refusing to grant a remedy because of the availability of a Tucker Act remedy) with Preseault, 494 U.S. at 17, 110 S.Ct. at 924 (because petitioners failed to utilize an available Tucker Act remedy, "[w]e need not decide whether a taking occurred in this case").[5] Adding to the confusion, many courts have viewed the Tucker Act as a jurisdictional hurdle against the payment of damages but not as an impediment to equitable relief. See, e.g., Southeast Kan. Community Action Program, Inc. v. Secretary of Agriculture, 967 F.2d 1452, 1456-57 (10th Cir.1992) (holding the Tucker Act "inapplicable" where injunctive and declaratory relief is sought; "[t]hus, ... the district court properly exercised jurisdiction").[6] This, of course, is totally wrong. Because a compensation remedy is available, any taking that may have occurred simply cannot violate the takings clause. We have no authority to decide the hypothetical question whether the 1995 Amendment would amount to an unconstitutional taking were it uncompensated. See, e.g., Rose Acre Farms, Inc. v. Madigan, 956 F.2d 670, 673 (7th Cir.) ("If compensation is forthcoming, the Constitution allows the taking. The Tucker Act offers whatever compensation the Constitution requires."), cert. denied, 506 U.S. 820, 113 S.Ct. 68, 121 L.Ed.2d 34 (1992).
 
 
 14
 Appellants also claim that the 1995 Amendment is not a taking for "public use" and thus violates the Fifth Amendment even if compensated. After Hawaii Housing Auth. v. Midkiff, 467 U.S. 229, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984), a legislative determination of what constitutes "public use" is subject to "an extremely narrow" review, and will be upheld so long as it's rational. Id. at 240, 243, 104 S.Ct. at 2329, 2330-31. Appellants assert that the 1995 Amendment was "nothing more than attempt to legitimize the [Regional Corporations'] self dealing ... through a private, curative act." Appellants' Reply Br. at 3. As proof of this assertion, they cite only one statement by the Amendment's sponsor, Senator Stevens, that it was intended to codify the Regional Corporations' MAA. Id. at 3 n. 5 (citing 141 Cong. Rec. S11345 (daily ed. Aug. 3, 1995)). But Senator Stevens was actually arguing that the 1995 Amendment codified the MAA to the extent the MAA accurately reflected the original intent of Congress when it authorized Regional Corporations to sell NOLs. See 141 Cong. Rec. S11345 (daily ed. Aug. 3, 1995). The Senator went on to justify the 1995 Amendment on the ground that it would "avoid future costly litigation." Id. Given the paucity of arguments by appellants on this issue, we hold that, assuming the 1995 Amendment constituted a taking, Congress had a rational reason for deciding it was for public use.
 
 
 15
 * * *
 
 
 16
 We AFFIRM the district court's dismissal of this case for failure to state a claim upon which relief can be granted. We express no view as to whether appellants had a property right that was destroyed by Congress; that is a question that will have to be answered by the Court of Federal Claims, if appellants choose to bring suit there.
 
 
 
 [1]
 Natives who do not live within an incorporated village receive at-large shares and are called, appropriately enough, "at-large shareholders."
 
 
 [2]
 The tax basis of the corporations' land was set at its fair market value at the time it was transferred to them as part of ANCSA's original implementation. 43 U.S.C. § 1620(c). Most of these transfers occurred in the late 1970s when commodity prices were at all-time highs and the Alaskan economy was booming due to construction of the Trans-Alaska pipeline. As a result, the native corporations' land carried artificially high tax bases and thus generated huge tax losses when sold in the mid-1980s. See Hal Bernton, IRS Ruling on Alaskan Tax Losses May Spell Trouble for Major Firms, Wash. Post, Aug. 28, 1990, at G3
 
 
 [3]
 The difference between the $425 million that went to the natives and the over $500 million in lost tax revenues found its way to investment bankers and such corporate giants as Pillsbury, Marriott, Quaker Oats, Campbell Soup, Emerson Electric Co., Winn-Dixie Stores, Inc., Seagram and Del E. Webb, Inc. See Ortega, Ice Fishing, Wash. Monthly, July 1988, at 10; Bernton, IRS Ruling, Wash. Post, Aug. 28, 1990, at G3; Anne Swardson, Aleut Alert: Firms Eye Tax Loopholes in Alaskan Concerns; Corporations in 'Gold Rush' to Buy Losses, Wash. Post, Oct. 21, 1986, at C1
 
 
 [4]
 The Regional Corporations contend that NOL revenues were not shareable under section 7(i) because they were derived from the tax laws, not from resources. See Appellees' Br. at 6. Appellants claim NOL revenues were shareable because most of the losses came from the sale of resources. See Appellants' Opening Br. at 31
 
 
 [5]
 Curiously, the Court has also invalidated federal statutes on takings clause grounds without even discussing the availability of a Tucker Act remedy. E.g., Hodel v. Irving, 481 U.S. 704, 107 S.Ct. 2076, 95 L.Ed.2d 668 (1987)
 
 
 [6]
 It's hard to blame the courts of appeals for making such mistakes given the Supreme Court's own inconsistency in this area. See LTV Steel Co. v. Shalala (In re Chateaugay Corp.), 53 F.3d 478, 492 (2d Cir.) ("On their face, the Supreme Court's decisions on federal Takings Clause jurisdiction have not been consonant."), cert. denied, --- U.S. ----, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995). In Duke Power Co. v. Carolina Envtl. Study Group, 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978), the Court suggested that the Tucker Act does not preclude district courts from granting equitable relief in the form of declaratory judgments in takings cases against the United States. Id. at 71 n. 15, 98 S.Ct. at 2629 n. 15. But in Monsanto, the Court held that equitable relief is not available when a Tucker Act remedy can be obtained. 467 U.S. at 1016, 104 S.Ct. at 2879-80. Our court has, nevertheless, held that neither injunctive nor declaratory relief is available for a takings claim against the United States. See Clouser v. Espy, 42 F.3d 1522, 1539-40 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 2577, 132 L.Ed.2d 827 (1995)