**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CONSEJO DE DESARROLLO
ECONOMICO DE MEXICALI, A.C.;
CITIZENS UNITED FOR RESOURCES
AND THE ENVIRONMENT,
              *Plaintiffs-Appellants,*

              and

DESERT CITIZENS AGAINST
POLLUTION,
                        *Plaintiff,*

STATE OF CALIFORNIA; BAND OF
MISSION INDIANS,
                    *Intervenors,*

              v.

UNITED STATES OF AMERICA; DIRK
KEMPTHORNE, Secretary of the
Department of the Interior; ROBERT
W. JOHNSON, Commissioner,
Bureau of Reclamation,
              *Defendants-Appellees,*

IMPERIAL IRRIGATION DISTRICT; SAN
DIEGO COUNTY WATER AUTHORITY;
CENTRAL ARIZONA WATER
CONSERVATION DISTRICT; STATE OF
NEVADA; SOUTHERN NEVADA WATER
AUTHORITY; STATE OF ARIZONA;

No. 06-16345

D.C. No.
CV-05-00870-PMP

4327

METROPOLITAN WATER DISTRICT OF
SOUTHERN CALIFORNIA AND THE
WESTERN URBAN WATER COALITION,
*Defendants-Intervenors-*
*Appellees,*

v.

CITY OF CALEXICO,
*Plaintiff-Intervenor.*

CONSEJO DE DESARROLLO
ECONOMICO DE MEXICALI, A.C.;
CITIZENS UNITED FOR RESOURCES
AND THE ENVIRONMENT,
*Plaintiffs,*

STATE OF CALIFORNIA; BAND OF
MISSION INDIANS,
*Intervenors,*

and

DESERT CITIZENS AGAINST
POLLUTION,
*Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA; DIRK
KEMPTHORNE, Secretary of the
Department of the Interior; ROBERT
W. JOHNSON, Commissioner,
Bureau of Reclamation;

No. 06-16618
D.C. No.
CV-05-00870-PMP

Dirk Kempthorne, Secretary;
William E. Rinne, Acting
Commissioner,
                    *Defendants-Appellees,*

State of Arizona; Metropolitan
Water District of Southern
California and the Western
Urban Water Coalition;
Colorado River Commission of
Nevada,
                    *Defendants-Intervenors-*
                                    *Appellees,*

                    and

Imperial Irrigation District; San
Diego County Water Authority;
Central Arizona Water
Conservation District; State of
Nevada; Southern Nevada Water
Authority; Colorado River
Commission of Nevada,
                    *Defendants-Intervenors,*

                    v.

City of Calexico,
                    *Plaintiff-Intervenor.*

CONSEJO DE DESARROLLO
ECONOMICO DE MEXICALI, A.C.;
CITIZENS UNITED FOR RESOURCES
AND THE ENVIRONMENT; DESERT
CITIZENS AGAINST POLLUTION,
*Plaintiffs,*

STATE OF CALIFORNIA; BAND OF
MISSION INDIANS,
*Intervenors,*

v.

UNITED STATES OF AMERICA; DIRK
KEMPTHORNE, Secretary of the
Department of the Interior; ROBERT
W. JOHNSON, Commissioner,
Bureau of Reclamation; DIRK
KEMPTHORNE, Secretary; WILLIAM
E. RINNE, Acting Commissioner,
*Defendants-Appellees,*

and

IMPERIAL IRRIGATION DISTRICT; SAN
DIEGO COUNTY WATER AUTHORITY;
CENTRAL ARIZONA WATER
CONSERVATION DISTRICT; STATE OF
NEVADA; SOUTHERN NEVADA WATER
AUTHORITY; STATE OF ARIZONA;
METROPOLITAN WATER DISTRICT OF
SOUTHERN CALIFORNIA AND THE
WESTERN URBAN WATER COALITION;

No. 06-16664

D.C. No.
CV-05-00870-PMP

OPINION

Colorado River Commission of
Nevada,
          *Defendants-Intervenors,*

v.

City of Calexico,
               *Plaintiff-Intervenor-*
                    *Appellant.*

Appeals from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted December 4, 2006
Reargued February 21, 2007—San Francisco, California[1]

Filed April 6, 2007

Before: John T. Noonan, A. Wallace Tashima, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thomas

---

[1]Dirk Kempthorne has replaced Gale A. Norton as Secretary of the Interior and Robert W. Johnson has replaced John W. Keys, III as the Commissioner of the Bureau of Reclamation. Therefore, pursuant to Fed. R. App. P. 43(c)(2) the new officials are substituted as parties.

## COUNSEL

R. Gaylord Smith and Sheri Schwartz, Lewis Brisbord, Bisgaard & Smith, LLP, San Diego, California, and Jay F. Stein, Stein & Brockman, PA, Santa Fe, New Mexico, for plaintiff-appellant Consejo de Desarrollo Economico de Mexicali, A.C.

William J. Snape, III, Law Office of William J. Snape, III, Washington, DC, for plaintiff-appellant Citizens United for Resources and the Environment.

Gideon Kracov, Law Office of Gideon Kracov, Los Angeles, California, for plaintiff-appellant Desert Citizens Against Pollution.

Steven E. Boehmer, James P. Lough and Jennifer M. Lyon, McDougal, Love & Eckis, El Cajon, California, for intervenor-plaintiff-appellant City of Calexico.

Matthew J. McKeown, David C. Shelton and John L. Smeltzer, United States Department of Justice, Washington, DC, for defendants-appellees United States of America, Dirk Kempthorne, Secretary of the Department of the Interior, and Robert W. Johnson, Commissioner of the Bureau of Reclamation.

John P. Carter and William H. Swan, Horton, Knox, Carter & Foote, El Centro, California; Anthony Geunther and Andrew P. Gordon, McDonald, Carano, Wilson, Las Vegas, Nevada; and David L. Osias and Mark J. Hattam, Allen, Matkins,

Leck, Gamble, Mallory & Natsis, San Diego, California, for intervenor-defendant-appellee Imperial Irrigation District.

Daniel S. Hentschke, San Diego County Water Authority, San Diego, California; James D. Hibbard, Bullivant Houser Bailey, PC, Las Vegas, Nevada; and Steven L. Hoch, Scott S. Slater and C. Wesley Strickland, Hatch & Parent, Los Angeles, California, for intervenor-defendant-appellee San Diego County Water Authority.

Virginia S. Albrecht, Hunton & Williams, Washington, DC; Douglas Miller, Central Arizona Project, Phoenix, Arizona; Kathy Robb, Hunton & Williams LLP, New York, New York; and Kevin P. Stolworthy, Jones Vargas, Las Vegas, Nevada, for intervenor-defendant-appellee Central Arizona Water Conservation District.

Jennifer T. Crandall, Las Vegas, Nevada, and James Taylor and John J. Entsminger, Southern Nevada Water Authority, Las Vegas, Nevada, for intervenor-defendant-appellee State of Nevada.

Nancy L. Allf, Parsons, Behle & Latimer, Las Vegas, Nevada, and Linus Masouredis, Metropolitan Water District of Southern California, Sacramento, California, for intervenor-defendant-appellee Metropolitan Water District of Southern California.

Michael B. Wixom and Shann D. Winesett, Smith Larsen & Wixom, Las Vegas, Nevada, for intervenor-defendant-appellee State of Arizona.

William Jenkins and Clifford T. Lee, Office of the California Attorney General, San Francisco, California, for intervenor State of California.

Mary Hackenbracht and David A. Hombeck, Reno, Nevada, and Joseph R. Membrino, Hall, Estill, Hardwick, Gable, Gol-

den & Nelson, Washington, DC, for intervenor La Jolla, Rincon, San Pasqual, Pauma, and Pala Bands of Mission Indians.

Sheldon H. Sloan, Los Angeles, California, for amicus curiae Government of Mexico.

Robert Vera Avar, The State of Baja California, Mexico, for amicus curiae State of Baja California, Mexico.

Kara Gillon, Defenders of Wildlife, Albuquerque, New Mexico, for amicus curiae Defenders of Wildlife.

---

**OPINION**

THOMAS, Circuit Judge:

This case involves a dispute over a Bureau of Reclamation project to build a concrete-lined canal to replace an unlined portion of the All-American Canal. The district court denied declaratory and injunctive relief. A motions panel of our Court granted a temporary injunction halting work on the project pending appeal. After the initial oral argument and based on intervening legislation, the United States filed a motion to vacate the injunction and to remand the action to the district court with instructions that several of the claims be dismissed as moot. We held a second oral argument to consider the motion.

After consideration of the extensive briefing and arguments of the parties, we conclude that the environmental and other statutory claims are moot and that the district court lacked subject matter jurisdiction over the remaining claims. We vacate the injunction of the project pending appeal and remand the case to the district court with instructions to dismiss it.

## I

Colorado Poet Laureate Thomas H. Ferril described the West by saying: "Here is the land where life is written in water." The legacy of the West is one of continual, and often bitter, controversies about water rights, both above and below the surface. In the West, "whiskey is for drinking; water is for fighting over," Mark Twain is said to have observed. Our water dispute brings us to the Mexican-California border and the plans of the United States Bureau of Reclamation to prevent the All-American Canal from seeping water—seepage upon which thousands of Mexicans rely.

The All-American Canal is one of the world's largest irrigation canals, carrying water from the Colorado River to the Imperial Valley in California. The Imperial Valley lies between the Mexican boundary and the Salton Sea, bounded on the east by sandhills and on the west by the foothills of the San Diego Mountains. The canal is the valley's only source of water.

The All-American Canal replaced the Alamo canal, which diverted water a short distance north of the Mexican border, but transported water mostly through Mexico before it recrossed the border into the Imperial Valley. In the 1920's, considerable sentiment arose to have a canal that was entirely contained within the boundaries of the United States— perhaps in furtherance of the notion of character Noah Cross (slightly paraphrased), that "either you bring the water to California, or you bring California to the water."[2] In any event, the concept of an "all-American" canal was born.

The All-American Canal System was authorized under the Boulder Canyon Project Act of December 21, 1928, 45 Stat. 1057, *codified at* 43 U.S.C. § 617. Construction of the canal by the United States Bureau of Reclamation commenced in

---

[2]*Chinatown* (Paramount 1974).

1934 following the construction of the Hoover Dam, with the project reaching completion in 1942. The design was aimed to have the water transported entirely within the United States. The new canal, as designed, flowed only in the United States. However, water often refuses to be confined by our artificial restraints. Thus, although the canal's surface water remained in the United States, its seepage did not— recharging the Mexicali Aquifer and providing a reservoir of groundwater to the Mexicali Valley on the other side of the border. The Mexicali Aquifer underlies both the Imperial Valley in California and the Mexicali Valley in Mexico. The complaint alleges that the roughly 1.3 million people who live in the Mexicali Valley depend on the groundwater from the aquifer, which irrigates thousands of acres of farmland.

Prior to 1901, the aquifer was recharged by the Colorado and Alamo rivers. Because it was unlined, the construction of the Alamo Canal did not impact the recharge of the aquifer. Congress considered the idea of lining the All-American Canal, but ultimately decided on an earthen and porous design that did allow seven percent of the volume to seep into northern Mexico.

Seepage from the All-American Canal first caused widespread flooding in the Mexicali Valley until mechanisms were put in place to harness the water. The residents and businesses of the Mexicali Valley have since expended considerable resources to create an infrastructure of pumping facilities and conveyance equipment that deliver the water for drinking and irrigation. As a result, the complaint alleges that a large metropolitan community has developed in reliance on the water.

In 1944, the United States and Mexico entered into a treaty designed to govern the allocation of Colorado River water between the two nations. *See* Treaty Between the United States of America & Mexico Respecting Utilization of Waters of the Colorado and Tijuana Rivers and of the Rio Grande

["1944 Treaty"], 59 Stat. 1219, T.S. No. 994, Section III, Art. 10 (Nov. 8, 1945).

The Treaty came in the context of a developing set of domestic authorities designed to regulate the use of Colorado River water known collectively as the "Law of the River." After the first World War, as Congress began considering further ways to capture and regulate Colorado River water, the states constituting the Upper Basin of the river (Colorado, Utah, New Mexico and Wyoming) grew concerned that states in the Lower Basin (Arizona, Nevada and California) would begin to claim appropriation rights to the water. *See Maricopa-Stanfield v. United States*, 158 F.3d 428, 430 (9th Cir. 1998). The Colorado River Compact of 1922 apportioned 7.5 million acre feet of water annually to the Lower Basin states to forestall any disputes. *See* Act of August 19, 1921, art. 2, 43 Stat. 171, *reprinted in* Ariz. Rev. Stat. § 45-1311. The Boulder Canyon Project Act of 1928 ("Canyon Project Act") then apportioned that 7.5 million acre feet among the Lower Basin states. *See Maricopa-Stanfield*, 158 F.3d at 430. To deliver the allocations called for in the Act, the Canyon Project Act authorized the construction of the All-American Canal. *See* 43 U.S.C. § 617. The apportionment between the Lower Basin states has also been the subject of a series of Supreme Court decisions and decrees, culminating in *Arizona v. California*, 126 S. Ct. 1543 (2006) ("Consolidated Decree").

The Treaty requires the United States to deliver 1.5 million acre feet of Colorado River water to Mexico annually at designated diversion points on the international land boundary as specified in the Treaty. The Treaty also commits the United States to delivering an additional 200,000 acre feet in any year in which there is a surplus of Colorado River water in excess of the amount required to satisfy other obligations. The Treaty then states that "Mexico shall acquire no right beyond that provided by this subparagraph by the use of the waters of the Colorado River system, for any purpose whatsoever, in

excess of the 1,500,000 acre feet . . . annually." 1944 Treaty at Art. 10. The Treaty commits the United States to constructing the works necessary to deliver these waters to the diversion points. The Treaty considered the All-American Canal to be one of the mechanisms for delivery. The Treaty committed to the International Boundary and Water Commission ("Boundary Commission") the authority to resolve disputes arising under the Treaty. *Id.* at Art. 2, 24(d).

In 1973, the Boundary Commission issued "minute 242" addressing the problem of the salinity of the Colorado River. *See* Agreement Confirming Minute No. 242 of the International Boundary and Water Commission, U.S. and Mex., 24 U.S.T. 1968 (Aug. 30, 1973). The minute acknowledged that there was no existing agreement governing groundwater issues in the border area between the two nations. The agreement also stated that "[w]ith the objective of avoiding future problems, the United States and Mexico shall consult with each other prior to undertaking any new development of either the surface or the groundwater resources, or undertaking substantial modifications of present developments, in its own territory in the border area that might adversely affect the other country." *Id.*

In 1988, Congress passed the San Luis Rey Indian Water Rights Settlement Act ("Settlement Act") which authorized the Secretary of the Interior ("Secretary") to select one of three options for recovering the seepage lost through the All-American Canal. Pub. L. No. 100-675, 102 Stat. 4000, § 203. The choices included constructing a parallel lined canal, lining the existing canal, or constructing seepage recovery facilities such as a well-field between the All-American Canal and the border. The Secretary also considered a no action option. The Settlement Act explained that "significant quantities of water currently delivered into the All American Canal and its Coachella Branch are lost by seepage from the canals and that such losses could be reduced or eliminated by lining these canals." *Id.* at § 201. The conserved water was to be used to

meet the growing needs of California consumers, as well as to settle water rights claims brought by several Native American groups. *Id.* at §§ 106, 204. The Imperial Irrigation District ("IID"), with whom the Secretary contracts to manage the All-American Canal, and the Metropolitan Water District of Southern California ("MWD") would deliver the additional water to consumers. *Id.* at § 202.

The Secretary then undertook several environmental studies to consider the impact of the All-American Canal lining project ("Lining Project") and issued a final environmental impact statement ("FEIS") and record of decision ("ROD") in 1994. The FEIS was noticed in the Federal Register at that time. 59 Fed. Reg. 18,573 (Apr. 19, 1994). After consideration of all the alternatives, the ROD selected the parallel lined canal option and the Bureau of Reclamation approved the ROD on July 29, 1994.

Thereafter, the United States engaged in a diplomatic interchange with Mexico and the Mexican section of the Boundary Commission. There is some dispute as to the nature and extent of that exchange. The United States claims that it engaged in an extensive consultation progress; Mexico, as amicus, complains of cursory and insufficient consultation.

The Lining Project lay dormant, however, because the Settlement Act required that the project be paid for by entities benefitting from the conserved seepage and not by the United States. Settlement Act at § 203. While the plan was dormant, the Bureau of Reclamation conducted a reexamination of the FEIS in 1999, but determined that no new significant information changed the initial analysis and thus a supplemental environmental impact statement ("SEIS") was not required.

By 2002, the State of California was using over five million acre feet of Colorado River water per year, 600,000 acre feet above its 4.4 million acre feet allotment under the terms of the Canyon Project Act and Consolidated Decree. Awareness of

the size of this usage led to an intensive effort by the region's water users to assist California in reducing its historical over-use of Colorado River water. This effort led to a series of agreements in 2003 between the United States, the MWD, Coachella Valley Water District, IID, San Diego County Water Authority ("SDCWA"), the La Jolla, Pala, Pauma, Rincon & San Pasqual Bands of Mission Indians, the San Luis Rey River Indian Authority, and the City of Escondido & Vista Irrigation District (the "Allocation Agreement"). The Allocation Agreement provided how the conserved seepage water would be allocated. One aspect of the agreement was that the State of California would pay for the Lining Project.

With the project back on track, the Bureau of Reclamation asked the United States Fish and Wildlife Service ("FWS") to confirm as a biological opinion a conference opinion the FWS had issued on February 8, 1996, regarding the Lining Project's impact on the Peirson's Milk Vetch, a threatened plant species. FWS so confirmed the opinion on September 9, 2004.

On July 19, 2005, this action was filed in the District of Nevada seeking to enjoin the Lining Project. The Plaintiffs consisted of Consejo de Desarrollo Economico de Mexicali, A.C. ("Consejo"), a Mexican community group, and two American non-profit environmental groups ("Environmental Plaintiffs") (Citizens United for Resources and the Environment ["CURE"] and Desert Citizens Against Pollution ["Desert Citizen"]). The City of Calexico, California, ("Calexico") later intervened as a plaintiff as to one count of the complaint. The parties stipulated to, and the district court approved, the intervention of multiple entities on the side of the defense, including the Imperial Irrigation District, the San Diego County Water Authority, the Central Arizona Water Conservation District, the State of Nevada, the Southern Nevada Water Authority, and the Colorado River Commission of Nevada. The court also has been aided at various points in the proceedings by other interested parties and amici.

After the district court dismissed a number of counts in the original complaint, the Plaintiffs filed an amended eight-count complaint on February 23, 2006, seeking declaratory and injunctive relief. The first four counts were brought by Consejo, on behalf of a class of beneficial users of the Mexicali Aquifer and the All-American Canal on the Mexican side of the border. Count One alleged an "unconstitutional deprivation of property without due process of law in violation of the class' substantive and procedural rights." Count Two alleged a constitutional tort pursuant to *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), based on the "usurpation of water rights owned by the well owners and water users in the Mexicali Valley" by the Secretary and the Commissioner of the Bureau of Reclamation. Count Three alleged that the "application of water rights priorities in the present context is subject to the doctrines of equitable apportionment or equitable use," and that "[t]he Secretary and Commissioner have an affirmative duty to configure and implement the All-American Canal Project in a manner that results in the reasonable utilization of the water resources of the Mexicali Valley." Count Four alleged that the "Secretary and Commissioner are estopped from operating the All-American Canal" in any manner that would block the seepage that has recharged the Mexicali Aquifer for the preceding 63 years.

All of the Plaintiffs joined in Count Five, which alleged a violation of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"). In this count, the Plaintiffs argued that the Secretary and Commissioner failed to prepare a SEIS despite the existence of significant new circumstances bearing on the proposed project. The Plaintiffs argue that five new circumstances warrant preparation of a SEIS: (1) the discovery of the Andrade Mesa Wetlands in Mexico and its importance as a habitat for the endangered Yuma Clapper Rail after preparation of the FEIS; (2) the anticipated transborder socio-economic impacts from the water loss, which has been altered and exacerbated since

the FEIS by demographic changes and the passage of NAFTA; (3) new reports suggesting possible unexplored impacts on the Salton Sea; (4) alterations in the project plan with regard to human safety mechanisms designed to prevent drowning; and (5) changes in the air quality condition of the affected region. The district court later granted Plaintiff in Intervention status to Calexico as to this count.

The final three counts were brought by the Environmental Plaintiffs. Count Six alleged violations of the Endangered Species Act. Specifically, the amended complaint alleged that Bureau of Reclamation failed to reinitiate consultations with the FWS as required despite new information about wetlands habitat and the species therein—namely, the Yuma Clapper Rail and the Peirson's Milk Vetch—which came to light after the FEIS and biological opinions in existence had been issued. Count Seven alleged an unlawful taking of a listed migratory bird in violation of the Migratory Bird Treaty Act. Count Eight alleged violations of environmental requirements that were made a part of the Settlement Act. The amended complaint also alleged that no amount of damages would be sufficient and thus equitable relief was necessary.

Subsequent to the filing of the complaint in this case, on November 18, 2005, the Bureau of Reclamation issued a biological analysis for the Lining Project regarding the Potential Species Impact in the Republic of Mexico and transmitted it to the FWS. The FWS informed the Bureau of Reclamation by memorandum dated January 11, 2006, that, in its opinion, consultation with FWS was not required by the ESA when the impacts being considered take place in foreign territory. One day later, on January 12, 2006, the Bureau of Reclamation issued a Supplemental Information Report ("SIR") which determined that no substantial changes, significant new information, or circumstances existed that would require the Bureau of Reclamation to issue a SEIS.

The Plaintiffs moved for summary judgment as to Count Five (NEPA violations) and CURE moved for summary judg-

ment as to Count Six (Endangered Species Act violations). The Defendants opposed those motions and cross-moved for summary judgment on those claims. The Defendants also moved to dismiss counts 1-4 and 6-8 of the amended complaint for lack of standing, and contended in addition that claims five, seven and eight were time barred.

On June 23, 2006, the district court granted the motion to dismiss Consejo with respect to Counts 1-4 and 6-8, but denied the motion to dismiss CURE with respect to Counts 6-8. The order also held that Counts Seven and Eight were time-barred and that Count Five was time-barred with respect to any challenge to the 1994 FEIS, but not with respect to any challenge to the Bureau of Reclamation's failure to produce a SEIS.

On July 3, 2006, the district court denied The Plaintiffs' motion for summary judgment as to Count five and CURE's motion for summary judgment as to Count Six and granted The Defendants' cross-motions on both those counts. Judgment was entered on July 3, 2006. The Plaintiffs filed timely appeals from the judgment.

The Plaintiffs then filed a motion in the district court for an injunction pending appeal, which was denied. The Plaintiffs filed a motion for an injunction pending appeal with this Court, which was granted by a motions panel of the Court.

After we heard oral argument on the merits of the appeal in December 2006, Congress enacted and the President signed into law the Tax Relief and Health Care Act of 2006, Pub. Law No. 109-432, 120 Stat. 2922 ("2006 Act"). Contained within the 274-page omnibus tax bill were sections directly affecting the Lining Project. In pertinent part, the 2006 Act provided that:

> (a)  . . . Notwithstanding any other provision of law, upon the date of enactment of this Act, the Secretary

shall, without delay, carry out the All American Canal Lining Project identified — (1) as the preferred alternative in the record of decision for that project, dated July 29, 1994; and (2) in the allocation agreement allocating water from the All American Canal Lining Project, entered into as of October 10, 2003.

(b)   . . . (1) . . . Subject to Paragraph (2), if a State conducts a review or study of the implications of the All American Canal Lining Project as carried out under subsection (a), upon request from the Governor of the State, the Commissioner of Reclamation shall cooperate with the State, to the extent practicable, in carrying out the review or study.

(2)   Restriction of Delay.— A review or study conducted by a State under paragraph (1) shall not delay the carrying out by the Secretary of the All American Canal Lining Project.

*Id.* at § 395. Section 397 of the 2006 Act provides that:

The Treaty between the United States of America and Mexico relating to the utilization of waters of the Colorado and Tijuana Rivers and of the Rio Grande, and supplementary protocol signed November 14, 1944, signed at Washington February 3, 1944 (59 Stat. 1219) is the exclusive authority for identifying, considering, analyzing, or addressing impacts occurring outside the boundary of the United States of works constructed, acquired, or used within the territorial limits of the United States.

*Id.* at § 397.

Following the effective date of the 2006 Act, the United States filed a motion to remand this case to the district court

with instructions that Counts Five through Eight of the amended complaint be dismissed as moot and for an order vacating the injunction pending appeal imposed by the motions panel. The Plaintiffs vigorously opposed the motion, and we heard argument on the motion.

## II

If legislation passing constitutional muster is enacted while a case is pending on appeal that makes it impossible for the court to grant any effectual relief, the appeal must be dismissed as moot. *Paulson v. City of San Diego*, 475 F.3d 1047, 1048 (9th Cir. 2006). Here, the government contends that enactment of the 2006 Act renders the statutory environmental claims contained in Counts 5-8 of the amended complaint moot. In those counts, the Environmental Plaintiffs allege that the Lining Project cannot proceed until the government complies with NEPA, the Endangered Species Act, the Migratory Bird Treaty Act, and the Settlement Act.

## A

In examining the impact of the 2006 Act on this case, we employ our usual methodology in statutory construction. As always, our starting point is the plain language of the statute. *Children's Hosp. & Health Ctr. v. Belshe*, 188 F.3d 1090, 1096 (9th Cir. 1999). "[W]e examine not only the specific provision at issue, but also the structure of the statute as a whole, including its object and policy." *Id.* If the plain meaning of the statute is unambiguous, that meaning is controlling and we need not examine legislative history as an aid to interpretation unless "the legislative history clearly indicates that Congress meant something other than what it said." *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 877 (9th Cir. 2001) (en banc). If the statutory language is ambiguous, we consult legislative history. *United States v. Daas*, 198 F.3d 1167, 1174 (9th Cir. 1999).

The government underscores the provisions of the 2006 Act that direct the Bureau of Reclamation to proceed with the Lining Project "without delay" and "notwithstanding any other provision of law." 2006 Act, § 395(a). The government contends that the import of this language is to exempt the Lining Project from compliance with any other federal law.

[1] Assuming it uses constitutional means, Congress may exempt specific projects from the requirements of environmental laws. *See Sierra Club v. USFS*, 93 F.3d 610, 613-14 (9th Cir. 1996); *Mt. Graham Coalition v. Thomas*, 89 F.3d 554, 556-58 (9th Cir. 1996); *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1457-61 (9th Cir. 1992); *Stop H-3 Ass'n v. Dole*, 870 F.2d 1419, 1432 (9th Cir. 1989) (noting that Congress may "moot a pending controversy by enacting new legislation"). Our first task in examining the statute is to determine whether Congress intended that result.

[2] The fact that the 2006 Act used the phrase "notwithstanding any other provision of law" is not dispositive. *United States v. Novak*, 476 F.3d 1041, 1046-47 (9th Cir. 2007) (en banc). Indeed, "[w]e have repeatedly held that the phrase 'notwithstanding any other provision of law' is not always construed literally." *Or. Natural Res. Council v. Thomas*, 92 F.3d 792, 796 (9th Cir. 1996). Rather, when the phrase is used, we have determined its reach by "taking into account the whole of the statutory context in which it appears." *Novak*, 476 F.3d at 1046. In viewing the statutory context, we attempt "to give effect, if possible, to every clause and word of a statute, rather than to emasculate an entire section," *Estate of Reynolds v. Martin*, 985 F.2d 470, 473 (9th Cir. 1993), mindful that "[t]he cardinal principle of statutory construction is to save and not to destroy," *id.*

[3] Placing the "notwithstanding" language of the 2006 Act in context, we are guided by the further statutory language that the Lining Project proceed "without delay" "upon the enactment of this Act." 2006 Act § 395(a). If Congress had

intended for the Lining Project to proceed under the usual course of administrative proceedings, it would have been unnecessary for Congress to act at all. The environmental challenges would have been resolved in due course. However, proceeding along the usual course of resolving environmental disputes would be inconsistent with the Bureau of Reclamation proceeding "without delay" "upon the enactment of this Act." The Environmental Plaintiffs allege in their complaint that the Lining Project violates various federal environmental statutes and cannot proceed until the government complies with those strictures. Thus, application of the cited statutes cannot be reconciled with the language of the 2006 Act. Under those circumstances, when Congress has directed immediate implementation "notwithstanding any other provision of law," we have construed the legislation to exempt the affected project from the reach of environmental statutes which would delay implementation. *Mt. Graham Red Squirrel*, 954 F.2d at 1456. That is not to say the agency may act lawlessly in completing the project. *See Or. Natural Res. Council*, 92 F.3d at 797 (rejecting the idea that the phrase "notwithstanding any other provision of law" "require[d] the agency to disregard all otherwise applicable laws," other than the environmental statutes at issue). Rather, we have applied a common sense construction of the phrase to refer to those laws that would delay the commencement of a project in derogation of express Congressional directive to proceed immediately or, in this case, "without delay."

[4] Applying these principles to the case at hand, we must conclude as a matter of statutory construction that the 2006 Act renders the challenges to commencement of the Lining Project based on NEPA, the Endangered Species Act, the Migratory Bird Treaty Act, and the Settlement Act (contained in Counts Five through Eight of the amended complaint) moot. Each of those claims, if relief were to be granted, would delay commencement of the Lining Project. Congress has instructed otherwise, "notwithstanding any other provision of law." Therefore, we must construe the 2006 Act as exempting

the Lining Project from the identified statutory claims. If valid, the 2006 Act thus exempts the Bureau of Reclamation from the challenges contained in Counts 5-8 of the amended complaint.

B

Having determined the 2006 Act's statutory reach, we turn to the Plaintiffs' other objections to the application of the 2006 Act to the instant case. The Plaintiffs contend that the 2006 Act (1) violates the Tenth Amendment, (2) invades the judiciary's Article III powers, (3) violates the Equal Protection Clause, and (4) deprives them of protected constitutional interests without due process of law.[3] None of these arguments is persuasive.

1

The Plaintiffs argue that the 2006 Act violates the Tenth Amendment because it requires the Bureau of Reclamation to commandeer California's resources to carry out the project given that the Settlement Act directs that "[n]o federal funds are authorized to be appropriated to the Secretary for con-

---

[3]The Plaintiffs make two additional claims that we do not address. First, the Plaintiffs contend that if the currently-planned project proceeds it will violate the 2006 Act itself, because the Act calls for implementation of the preferred alternative as determined by the 1994 ROD, but the plan has changed since then—namely, the 1994 plan called for human safety ridges on the canal to prevent drowning while the 2006 plan calls for ladders. Because the complaint never alleged violations of the 2006 Act—indeed, it could not have—that claim is not properly before us.

Likewise, Desert Citizen claims that the 2006 Act still requires compliance with the air quality commitments made in the 1994 FEIS and ROD. We agree and the government does not dispute this point. Desert Citizen has not alleged that Reclamation is not in compliance with those commitments. To the extent Desert Citizen's claim is that the project is or will be in violation of the 2006 Act if it does not so comply, that claim is similarly not before us.

struction of [the canal]." Pub. L. No. 100-675, § 203(e)(1), 102 Stat. 4000 (Nov. 17, 1988).

As with all claims, we must satisfy ourselves that we have jurisdiction. We must determine independently that the Article III requirement of a live case or controversy has been met, even if the issue has not been raised by the parties. *See American Civil Liberties Union of Nev. v. Lomax*, 471 F.3d 1010, 1015 (9th Cir. 2006). If a "live" controversy does not exist, the case is moot. *Id.* (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)).

**[5]** Here, the Plaintiffs argue that if the 2006 Act goes into effect, it will require the commandeering of California's financial resources. However, California has already agreed to appropriate its financial resources to the Lining Project. *See* The Allocation Agreement. Therefore, the controversy the Plaintiffs seek to litigate by this challenge—whether the United States may appropriate California's resources—no longer exists. Accordingly, we hold that this claim is moot and we therefore lack jurisdiction to reach its merits.

2

The Plaintiffs also contend that the 2006 Act violates the principle of separation of powers by dictating a specific result in a pending judicial case. Congress may change the substantive law governing a pending case so long as it does not "direct any particular findings of fact or application of law, old or new, to fact." *Robertson*, 503 U.S. at 438. However, "[t]he constitutional principle of separation of powers is violated where (1) Congress has impermissibly directed certain findings in pending litigation, without changing any underlying law, or (2) a challenged statute is independently unconstitutional on other grounds." *Ecology Ctr. v. Castaneda*, 426 F.3d 1144, 1148 (9th Cir. 2005) (internal quotation marks and citations omitted).

**[6]** This type of controversy and claim is not new. We have considered similar challenges in the context of planned government action, and concluded that similar legislation did not violate the principle of separation of powers. *Ecology Ctr.*, 426 F.3d at 1148-49; *Mt. Graham Red Squirrel*, 954 F.2d at 1457-58; *Stop H-3 Ass'n*, 870 F.2d at 1431. As in the legislation underpinning our prior decisions, the 2006 Act does not direct us to make any findings or to make any particular application of law to facts. Rather, the legislation changes the substantive law governing pre-conditions to commencement of the Lining Project. As such, it does not violate the constitutional separation of powers.

3

The Plaintiffs next claim that the 2006 Act violates the Equal Protection Clause by selectively denying Latinos their fundamental life and property interests in a healthy environment because the affected Imperial Valley region has a large Latino population.[4] They argue that strict scrutiny applies to the legislation since it discriminates against Latinos as a suspect class and that the Act cannot survive strict scrutiny review.[5]

---

[4]Although the Bureau of Reclamation, being a Federal agency, is not subject to the strictures of the Equal Protection Clause, "In *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954), the Supreme Court indicated that the Fifth Amendment's Due Process Clause, subjects the federal government to constitutional limitations that are the equivalent of those imposed on the states by the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause commands that no state shall deny any person the equal protection of the laws. U.S. CONST. amend. XIV, § 1." *Stop H-3 Ass'n,* 870 F.2d at 1429 n.18. We therefore read Desert Citizen's challenge as a Fifth Amendment claim.

[5]This contention is based on the claim that minority communities are often exposed to greater environmental hazards than non-minority communities. *See Kessler v. Grand Cent. Dist. Management Ass'n, Inc.*, 158 F.3d 92, 130 (2d Cir. 1998) (citing Michele L. Knorr, *Environmental Injustice*, 6 U. Balt. J. Envtl. L. 71, 77-84 (1997) (summarizing evidence of discrimination against minority and low-income communities with

We need not reach the merits of this claim because, on the record before us, Desert Citizen does not have standing to bring it.[6] "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth v. Laidlaw Envt'l Serv. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333 (1977)).

[7] Here, Desert Citizen fails the first of these three elements. It has not demonstrated that any of its members would have standing to bring this claim in their own right. Desert Citizen's argument, that it is being discriminated against on the basis of a suspect class—namely, Latinos—requires that its members are also members of that class. Nothing in the record indicates that they are. We further note that nothing in the record indicates that representing the interests of Latinos is germane to Desert Citizen's organizational purpose.

respect to pollution and hazardous waste disposal); Edward P. Boyle, Note, *It's Not Easy Bein' Green: The Psychology of Racism, Environmental Discrimination, and the Argument for Modernizing Equal Protection Analysis*, 46 Vand. L.Rev. 937, 968 (1993) ("A substantial amount of evidence shows that environmental discrimination is a national phenomenon."); Rachel D. Godsil, Note, *Remedying Environmental Racism*, 90 Mich. L.Rev. 394, 397 (1991) ("A host of studies have concluded that minorities are exposed to a higher level of pollution of all forms than are whites."); Marianne Lavelle & Marcia Coyle, *Unequal Protection: The Racial Divide in Environmental Law*, Nat'l. L.J., Sept. 21, 1992, at S2 (concluding from results of study that "federal government, in its cleanup of hazardous sites and its pursuit of polluters, favors white communities over minority communities under environmental laws meant to provide equal protection for all citizens")).

[6]We consider this claim brought exclusively by Plaintiff Desert Citizens as Plaintiff Consejo has failed to sufficiently argue this claim in its brief.

Accordingly, Desert Citizens does not have organizational standing to bring this claim.

4

**[8]** Desert Citizen also challenges the 2006 Act as violating its procedural due process rights by depriving its members of life and property interests in a healthy environment without due process of law. This challenge is based on the asserted failure of Congress to comply with its own procedural rules in adopting §§ 395 and 397 of the 2006 Act. We need not decide here whether the right to a healthy environment is of constitutional magnitude. *Cf. Stop H-3*, 870 F.2d at 1430 & n.21. Even assuming, arguendo, that it is, the procedural decision of Congress, discharging its function as a law-making body, not to hold a hearing on general legislation is a question not subject to judicial review. "It is the role of courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution." *Lewis v. Casey*, 518 U.S. 343, 349 (1996). "A controversy is nonjusticiable—i.e., involves a political question—where there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it.' " *Nixon v. United States*, 506 U.S. 224, 228 (1993) (quoting *Baker v. Carr*, 369 U.S. 186, 217(1962)). However, "the courts must, in the first instance, interpret the text in question and determine whether and to what extent the issue is textually committed." Here, Article I of the Constitution provides that "[e]ach House may determine the Rules of its Proceedings." U.S. Const., art. I, § 5. In short, the Constitution textually commits the question of legislative procedural rules to Congress. Thus, whether Congress decides to hold a hearing on legislation applicable to the general public is a non-justiciable political question beyond our power to review.

5

**[9]** Given that the 2006 Act passes constitutional muster on the claims raised by the Plaintiffs, we must give it full effect as we have construed it. Therefore, we conclude that, in light of the 2006 Act, we cannot fashion effective relief and the challenges raised in Counts 5-8 based on alleged past violations of NEPA, the Endangered Species Act, the Migratory Bird Treaty Act, and the Settlement Act are moot.

III

The remaining claims asserted by Consejo in Counts 1-4 based on various property rights and common law theories are not affected by the 2006 Act. However, for various reasons, the district court lacked subject matter jurisdiction over those claims.

A

**[10]** The district court lacked subject matter jurisdiction over Consejo's first claim, that its members were deprived of property without due process of law. Assuming, without deciding, that Consejo's members had a cognizable property interest, its remedy for an alleged takings claim is under the Tucker Act, 28 U.S.C. § 1491. A takings claim is premature until the plaintiffs have exhausted their rights under the Tucker Act. *Preseault v. ICC*, 494 U.S. 1, 17 (1990). This restriction is jurisdictional. "The simple fact is that we have no jurisdiction to address the merits of takings claims where Congress has provided a means for paying compensation for any taking that might have occurred." *Bay View, Inc. on behalf of AK Native Village Corps. v. Ahtna, Inc*. 105 F.3d 1281, 1285 (9th Cir. 1997).

**[11]** Consejo appears to be claiming that the Lining Project may be enjoined because it infringes on its members' property rights. However, as we noted in *Bay View*, "the government

is not prohibited from taking private property; indeed the eminent domain clause contemplates that the government *will* take private property as needed for public purposes, so long as it pays compensation." *Id.* at 1284. In short, jurisdiction over Consejo's takings claim lies in the Court of Federal Claims, not the District of Nevada.

B

The district court also lacked subject matter jurisdiction over Consejo's *Bivens* claims. In Count Two of the amended complaint, Consejo seeks to enjoin various individual government officials, based on *Bivens*, 403 U.S. 388. *Bivens* created a remedy for violations of constitutional rights committed by federal officials acting in their individual capacities. In a paradigmatic *Bivens* action, a plaintiff seeks to impose personal liability upon a federal official based on alleged constitutional infringements he or she committed against the plaintiff. *See, e.g.*, *Balser v. Department of Justice, Office of U.S. Trustee*, 327 F.3d 903, 909 (9th Cir. 2003). "[A] *Bivens* action can be maintained against a defendant in his or her individual capacity only, and not in his or her official capacity." *Daly-Murphy v. Winston*, 837 F.2d 348, 355 (9th Cir. 1987). This is because a *Bivens* suit against a defendant in his or her official capacity would merely be another way of pleading an action against the United States, which would be barred by the doctrine of sovereign immunity. *Nurse v. United States*, 226 F.3d 996, 1004 (9th Cir. 2000). Therefore, the Supreme Court has refused to extend *Bivens* remedies from individuals to agencies. *FDIC v. Meyer*, 510 U.S. 471, 484 (1994).

**[12]** Here, Consejo has sued various Federal officials in their official capacities. It seeks to enjoin official action. Consejo does not claim damages based on the past unconstitutional acts of Federal officials in their individual capacities. Therefore, the district court lacked subject matter jurisdiction over the claim because the United States has not consented to its officials being sued in their official capacities.

## C

Consejo's third and fourth claims (apportionment and estoppel) seek equitable remedies based on common law property rights. However, because the United States has not consented to be sued, the district court lacked subject matter jurisdiction over the claims.

The United States, as a sovereign, is immune from suit unless it has waived its immunity. *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 260 (1999); *United States v. Mitchell*, 445 U.S. 535, 538 (1980). A court lacks subject matter jurisdiction over a claim against the United States if it has not consented to be sued on that claim. *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). "When the United States consents to be sued, the terms of its waiver of sovereign immunity define the extent of the court's jurisdiction." *United States v. Mottaz*, 476 U.S. 834, 841 (1986) (citing *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). A waiver of sovereign immunity by the United States must be expressed unequivocally. *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33 (1992). As a general matter, purported statutory waivers of sovereign immunity are not to be liberally construed. *Id.* at 34.

The only waiver of the sovereign immunity of the United States cited by Consejo is the Administrative Procedure Act. Section 702 of the APA states that

> [a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action *within the meaning of a relevant statute*, is entitled to judicial review thereof. . . . The United States may be named as a defendant in any such action . . . Provided, That any mandatory or injunctive decree shall specify the Federal officer or officers . . . personally responsible for compliance.

5 U.S.C. § 702 (emphasis added).

However, as we have noted, "[d]espite the breadth of this language, the statute does not confer jurisdiction independent of some other specific statute." *Office of Governor, Territory of Guam v. Dep't of Health and Human Servs, Admin. on Dev. Disability,* 997 F.2d 1290, 1292 (9th Cir. 1993). In *Califano v. Sanders*, 430 U.S. 99, 107 n.6 (1977), the Supreme Court noted that the § 702 language must be read in conjunction with § 703, which suggested that the APA remedies under § 702 "look[ed] to outside sources of jurisdictional authority."

By itself, § 702 does not impose any substantive duties on agencies or government officials. It is a procedural statute that requires another relevant statute to form the legal basis for the complaint that the government has acted unlawfully. *See* Wright, Miller & Cooper, 14A *Federal Practice and Procedure* § 3659 (3d ed. 2006).

Here, Consejo's counts three and four rely not on relevant statutes that the Bureau of Reclamation is alleged to have violated, but rather on Consejo's members' common law water rights. In count three, Consejo alleges that "[t]he Secretary and Commissioner have an affirmative duty to configure and implement the All-American Canal Project in a manner that results in the reasonable utilization of the water resources of the Mexicali Valley," but it does not state from where that duty derives. In count four, Consejo only alleges that "[t]he Secretary and Commissioner are estopped from operating the All-American Canal Project differently" than before. Absent any relevant statute on which to judge the legality of the agency's actions, § 702 is inapplicable and cannot be invoked as a waiver of sovereign immunity.

[13] Therefore, Consejo's equitable claims of apportionment and estoppel are barred by sovereign immunity. Because

the United States has not consented to be sued, the district court lacked subject matter jurisdiction over the claims.

## IV

In sum, the 2006 Act renders the claims based on past violations of NEPA, the Endangered Species Act, the Migratory Bird Treaty Act, and the Settlement Act moot. The district court lacked jurisdiction over Consejo's takings claim, which must be asserted before the Court of Federal Claims. Consejo's remaining claims are barred by sovereign immunity.

We remand this case to the district court with instructions to dismiss Counts 5-8 as moot and to dismiss Counts 1-4 for lack of subject matter jurisdiction. We vacate the injunction pending appeal previously entered by the motions panel.[7] Given our decision, we need not and do not reach any other questions raised by the parties or relied upon by the district court. All pending motions are denied as moot.

**VACATED and REMANDED with instructions.**

---

[7]Because it is an interlocutory order pending appeal, see Fed. R. App. P. 8(a), our order vacating the injunction pending appeal shall become effective immediately upon the filing of this opinion, regardless of when the mandate issues.